**SWITZER et al. v. DRISCOLL et al.**

**No. 5715.**

Court of Appeal of Louisiana. Second Circuit.

June 30, 1938.

Rehearing Denied July 15, 1938.

Writ of Certiorari and Review Denied Aug. 5, 1938.

Jackson & Mayer, of Shreveport, for appellants.

Foster, Hall, Barret & Smith, of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiffs, Richard H. Switzer and Val Irion, residents of the City of Shreveport, Louisiana, fee owners, on May 26, 1936, executed in favor of Stewart Williams mineral lease to the following described lands in Caddo Parish, Louisiana: Lots 18, 19, 98, 149, 153 and 156, Subdivision of Northeast Quarter of Section 10, Township 20 North, Range 15 West. Each lot contained one acre.

Williams, on August 21, 1936, assigned his rights under the lease to defendant, J. Thomas Driscoll. He, in turn, made assignments severally to other persons of fractional interests in the entire lease or therein in so far as it affected said Lot 153; and some of these assignees conveyed in whole or part to others the interest in the lease acquired from Driscoll.

On September 16, 1936, petitioners conveyed to Driscoll, for the recited price of $10 cash, one-fourth of the oil, gas and other minerals (their royalty) in and under and that might be produced from said Lot 153, and on same day petitioners conveyed to John A. Bogan a like interest in and to their royalty under the original lease. Bogan thereafter assigned one-half of the interest by him acquired from petitioners to Mrs. Evelyn Doris Driscoll, of St. Louis, Missouri. At the date this suit was filed the records disclosed that the following named persons, besides Driscoll, were vested with an interest in and to said original lease, viz; Harney S. Bogan, Moudris

Oil Company, Edward M. Cooper, Paul Harnetiaux, W. A. Doty, Frank J. Evans, Leo C. Horal and Grebo Royalties, Inc. Because of their interests, these persons were necessary parties to this suit and were impleaded as defendants, together with Driscoll.

The lease to Williams contains the following, among a multitude of stipulations:

"2. Subject to the other provisions herein contained, this lease shall be for a term of one year from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

"3. The royalties to be paid by lessee, are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of lessor in the pipe line to which the wells may be connected; lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; * * *

"4. If operations for drilling are not commenced on said land on or before one year from this date this lease shall then terminate as to both parties, lessee having the privilege of drilling on any one lot of those described above and such drilling shall maintain this entire lease in full force and effect, as to all lots above described.

"5. * * * If at the expiration of the primary term oil or gas is not being produced on said land but lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than 30 consecutive days, and, if they result in the production of oil or gas, so long thereafter as oil or gas is produced from said land. * * *"

Petitioners allege that Driscoll and his co-lessees drilled a well in search of oil under said lease to Stewart Williams, and on or about November 30, 1936, it came in as a producer and continuously thereafter oil has flowed therefrom and has been saved at the rate of twenty barrels per day, the value thereof being $1.10 per barrel. They charge that said lessees have appropriated the entirety of the oil produced and saved from said well to their own use and benefit, and have not paid or offered to pay petitioners the rent or royalty due them. They aver that the value of the one-sixteenth part of said oil produced and saved, the proportion thereof due them, is $378.40. They pray for judgment for this amount against all defendants herein, and for a decree cancelling and setting aside the mineral lease given by them to Stewart Williams because of non-payment of rentals due thereunder. They further pray that the sale of one-fourth interest in the mineral rights under said Lot 153 to J. T. Driscoll, referred to above, be decreed to be null and void as having been executed without consideration to them.

Plaintiffs provoked the issuance of a writ of provisional seizure under which the sheriff seized all the drilling and producing equipment, etc., found on the leased premises.

Defendants moved to dissolve the writ of provisional seizure with damages, on several grounds. The motion was denied. They deny that any money amount is due plaintiffs on account of royalty right, and, therefore, deny that said lease should be annulled or cancelled. In contradiction of the allegations of the petition anent continuous and profitable production, we here quote in full a part of the answer because we think the testimony substantially sustains same, viz;

"Article Five of the answer is denied as written, but respondents admit that a well was drilled under said mineral lease located on Lot 153, which on or about November 30, 1936, began to show oil, and from false sands of the Woodbine series made heads of cut oil and gas with a great percentage of drilling mud and salt water, apparently coming into the well from a previously drilled and abandoned oil well located about fifty feet Northwest of said Irion & Switzer's well No. 1; said well produced cut oil with drilling mud and salt water intermittently, together with large amounts of parrafin which necessitated pulling and steaming liner and tubing continuously, with the result that the open hole below the casing frequently bridged over and heaved in, which obstruction of the open hole made the reworking operations on the well a serious obstacle to continuous production of the cut oil, drilling mud and salt water. As a result, and following prudent practice, the operators after months of expensive and diligent reworking operations decided to deepen the well, and if possible run a smaller string of casing to case off the false sands from

which the present small production of oil, drilling mud and salt water was believed to be coming, which drilling and re-working operations have been prosecuted without cessation from date of the commencement of the drilling of said well."

Defendants further aver that only 320 barrels of oil of a grade non-marketable as pipeline oil, has been produced and saved from the well, of which amount the full one-eighth due as royalty to the mineral owners has been impounded in a tank provided and furnished by lessees on the lease, notice thereof having been given by the agents and attorneys of the lessees to plaintiffs herein; that they at no time refused to deliver to plaintiffs their part of said royalty oil because no demand therefor was made upon them for same. Driscoll denies that the sale of one-fourth royalty interest to him by plaintiffs should be annulled, or that there is just cause for its annulment. He avers that the true consideration of this transfer was the agreement on his part to drill the well involved herein quickly, not waiting until the year for doing so had about expired, and that he complied with his agreement thereunder.

Plaintiffs' demands were rejected and their suit dismissed at their cost. They appealed.

Plaintiffs now virtually admit that their attack against the validity of the sale of one-fourth of their royalty rights to Driscoll is not sustained by proof. A study of the testimony bearing upon this issue leaves us convinced that the consideration for the execution of that instrument has not failed. Drilling of the well involved herein at the time and in the manner done by Driscoll was the true consideration of the contract. Even though the well ultimately proves to be a non-producer, that result will not militate against the integrity of the sale.

Driscoll began to drill the well about the last of September, 1936. The work was pursued assiduously. On or about November 15th he and others in close touch with operations thought that producing sand had been entered. The well was then 2,172 feet deep. Casing was set, and the usual steps taken to bring the well in. The drilling rig was replaced by a standard rig to pump the mud, water and sand from the well and, thereafter, the oil which it was confidently believed was in deposit below; but all concerned were soon disillusioned. The well did not then produce oil nor has it since been a producer in the true significance of that term. Some thought the oil showing was from false sand, but such a fact was impossible of immediate determination. Tests only could demonstrate the correctness or falsity of the belief. Driscoll and others interested, in view of the presence of many producing wells not far away, were hopeful of ultimately making a success of this one. Much effort was put forth and money expended in furtherance of the wish to accomplish this desideratum. The well was deepened to 2,312 feet with no increase in oil showing. The pump continuously brought up an admixture of oil, mud, sand and water, only a small percent of which was oil. This mixture was run into what is called a "shot gun" tank of 500 barrels capacity to which was connected stock or storage tanks of 250 barrels capacity. The function of the "shot gun" tank is to hold the contents pumped from the well until the oil, being the lighter, accumulates on top of the foreign matter with which it is intermingled. The mud and sand settles at the bottom. The connections between the tanks are so arranged that the oil automatically runs into the stock or storage tank and when of approved grade is piped therefrom to pipeline systems for ultimate refining. The record leaves little or no doubt in our mind that this well, because of excess paraffin content, has produced no pipeline oil. This character of oil must be 98% pure.

Having failed in all of his diligent efforts to make a producer of the well, on April 1, 1937, Driscoll employed Delmo Cryer, an experienced oil driller who had previously helped in drilling it, to do what was deemed needful to bring it in as a producer, if such were possible. Steps were taken to do this. The well was deepened 21 feet, and on May 19th pumping was resumed and continued through July 23rd. Intermittently the well would be shut down for periods of several days and it would then "head up". This was an encouraging sign. It was thought possible that by following this course the well, as has often been the case with others, would come in overnight as a producer. Cryer thinks the well should be drilled deeper and testified that Driscoll purposed to do that and otherwise exhaust all known methods for securing production before abandoning the venture on which has been

spent some $30,000, they say. Cryer further stated that between May 19 and July 24, a period of 65 days, only 250 barrels of oil were produced, an average of less than 4 barrels per day. Driscoll testified that all told only 320 barrels had been produced and saved. There is no positive testimony contradicting these figures.

Plaintiffs are sure, and so testified, that very soon after the well was thought to be a profitable producer, Driscoll told them that its output would be 20 barrels daily. Out of an exuberance of joy over the favorable prospect of profitable production, it is not unlikely that he made such a statement. But we know that all too often, in this manner, fortunes thought to be in hand are dispelled with developments. Conceding that he made the statement, its probative worth is wholly destroyed by positive contrary testimony, including his own.

Plaintiffs and others visited the well many times after pumping was resumed in May. They observed the pump in operation but found no one in charge. They discovered two lines of small piping leading from the tanks or the well to another well some 800 feet away in which Driscoll was also interested. Not being able to satisfy themselves otherwise, they concluded from the presence of these lines of piping and the continuous operation of the pump, that the well was a genuine producer and that its output was being piped from the situs and sold without consulting them and without payment to them of their proportion of its value. Acting upon this conclusion, they instituted the present suit. Evidently they labored under a misapprehension of the true facts. We think the presence of the two lines of small piping is satisfactorily explained. One was laid to transport gas from the well to another well of Driscoll's for fuel. The other one was laid to bring oil from another of Driscoll's producers to the unused storage tank to be impounded for use as fuel in another well close by.

Mr. Harney S. Bogan, who, in the capacity of broker, was instrumental in procuring the lease from plaintiffs to Williams, testified as a witness on behalf of defendants. He visited the well frequently while being drilled and thereafter. His interest in this well and profitable production therefrom is greater than that of plaintiffs. If plaintiffs are being defrauded of their rights, Bogan is being likewise treated. We reproduce a part of his testimony because we believe it correctly appraises the well's status, viz:

"Q. Have you got any royalty out of this well? A. I have not.

"Q. Do you know why you haven't got any? A. I just didn't figure it was a producing well. I have been out there several times. With all due respect to Tom Driscoll, he is like the fellow Bob Ingersoll wrote about, show him a feather and the air is full of birds. I think he thought he had a pretty good well, I went out there several times to look around and I might say in that connection that when they gave me a one-fourth interest, mine was a one-fourth mineral interest, if I didn't get mineral money I didn't get anything; I never got a dime of cash from Mr. Driscoll other than Five Dollars on some of my individual stuff. I went out there and looked at it and Tom Driscoll told me it would make fifteen or twenty barrels. He told me another well was making fifty and it was not, but he is in good faith I feel sure about it. I don't want to reflect on him at all. I really believe he thought in that case as he thought the other well was making fifty barrels that this was making fifteen or twenty. I don't think it ever made anything at all. I know it didn't at all. I went to see the head operator and I said, 'How much is this well making?' Joe said, 'It may make two barrels or five barrels.' "

Driscoll admits that all told he has hauled away about 200 barrels of the oil impounded in the storage tank. This, he says, was consumed as fuel in other drilling operations. At time of trial and continuously prior thereto, he testified that there was a sufficiency of the oil, such as it was, in the storage tank to satisfy the interest of all royalty owners. His testimony in this respect is corroborated by that of other witnesses. Only one testified that he found the tank empty after once having seen oil in it. Driscoll also testified that he sent word to plaintiffs that their part of the oil was impounded and should be removed by them. This word does not appear to have reached plaintiffs. They did not ask delivery of any oil but did inquire of Driscoll when they would receive payment for their royalty interest therein. As none of the oil has been sold from the premises, of course there is no money amount due the owners of the royalty, of whom Bogan is one.

Under the terms of the lease contract, the lessee or his assignees may satisfy the royalty interest of the lessors or their as-

signees by delivering to them at the well one-eighth of all oil "produced and saved", or by delivering same to their credit in the pipeline "to which the well may be connected". If no connection is made and the lessee or his assignees do not elect to purchase the interest of the royalty owners in the oil produced and saved, a right accorded by the lease, necessarily the lessors and/or their assignees are forced to take oil in satisfaction of their interest. The lease contract makes this very clear. Therefore, if it be conceded that the well is a producer and that plaintiffs are entitled to their royalty interest in its production, so long as a sufficiency of the oil is on hand subject to their acceptance, it cannot be said that the lease contract is subject to annulment for non-payment of rentals.

 It would seem rather unthinkable, if this well is a producer, as plaintiffs contend, that Driscoll for himself and his co-lessees would court the danger of being evicted from the lease by perpetrating fraud upon the royalty owners as is alleged. They stand to lose most by pursuing such a course. The testimony warranting a conviction on such a charge should be unusually weighty. Such testimony has not been adduced.

Cryer testified that the well was shut down on July 23, but not abandoned; that additional efforts to cause it to produce were intended. His testimony tends to disclose that no work was done on the well or effort exerted to cause it to produce from July 23 until date on which this suit was filed, August 25. Thirty-two days intervened during this period. Plaintiffs here, for the first time, charge that the lease is subject to annulment because there was a cessation of operations thereunder for more than thirty days; and in brief they urge us to decree such annulment for this cause. Their position is opposed by appellees on the elemental ground that as this issue was not raised or presented by the pleadings, and not having been urged or passed on below, it may not be appropriately raised here. Appellants rejoin by arguing that since the testimony, admitted without objection, proves cessation of operations for more than thirty days, this relief may be awarded under their prayer for "general and equitable" relief. The rule prevailing in such circumstances is as contended for by appellees. Exceptions to the rule might be cited. The present case should not be so classed. The record is not free of testimony to the effect that operations or efforts to bring about production were not entirely abandoned for the period of thirty days following July 23. Mr. Irion and two other witnesses positively testified that the well was being pumped actively on August 17. This was only eight days before the suit was filed and twenty-five days after the shut down on July 23. The fact that the pump was in operation on August 17 is urged by appellants in support of their contention that the well is a producer. The issue is a controverted one and should be threshed out, if at all, after being tendered in a court of original jurisdiction.

For the reasons herein assigned, the judgment appealed from is affirmed with costs.